1

SAN DIEGO COASTKEEPER
PATRICK MCDONOUGH (SBN 288285)

2

COURTNEY BROWN (SBN 360257)
8305 Vickers Street, Suite 209

3

San Diego, CA 92111
Ph: (619) 609-0860

4

Email: patrick@sdcoastkeeper.org

5

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)

6

LIVIA BORAK BEAUDIN (SBN 259434)
NATALIE CLAGETT (SBN 351072)

7

1140 South Coast Highway 101
Encinitas, CA 92024

8

Ph: (760) 942-8505
Fx: (760) 942-8515

9

Email: marco@coastlawgroup.com

10

11

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

12

13

SAN DIEGO COASTKEEPER, a non-profit
corporation; COASTAL

14

ENVIRONMENTAL RIGHTS
FOUNDATION,

15

a non-profit corporation,

16

17

Plaintiffs,

18

v.

19

PLAZA ALTA RECYCLING, LLC, a

20

California Limited Liability Company;

21

Defendant.

| | |
|---|---|
| Civil Case No. **'25CV0795 BEN MSB** | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)**

**(Unfair Competition Law – Unlawful Conduct under Bus. & Prof. Code § 17200 *et seq*.)**

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.    On December 17, 2024, Plaintiffs issued a 60-day notice letter ("Notice Letter") to PLAZA ALTA RECYCLING, LLC ("Defendant" or "Plaza Alta") as the owner and/or operator of the Facility located at 9246 Jamacha Road, Spring Valley, California 91977 ("Facility"), regarding its violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP," "Permit," or " Industrial General Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.    Plaintiffs mailed the Notice Letter to the Facility's physical address, 9246 Jamacha Road, Spring Valley, California 91977, and to Defendant's Agent for Service of Process at 23628 Barona Mesa Road, Ramona, California 92065 via certified mail.

4.    Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5.    More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.    In addition, this Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a), because the state law claims are related to the federal claims and form part of the same case or controversy.

7.    Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

**II.    INTRODUCTION**

8.    Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

9.    Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters and groundwater including Spring Valley Creek, the Sweetwater River, the San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

10.    Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

11.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

12.    Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds and numerous mammal species, as

well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

13.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

14.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

15.     The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members' use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

**III.     PARTIES**

16.     PLAZA ALTA RECYCLING LLC is an active California Limited Liability Company and is the Owner and/or Operator of the Facility.

17.     Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges,

1    and habitat degradation.

2        18.    CERF is a non-profit public benefit corporation organized under the laws of

3    the State of California with its office located in Encinitas, California. CERF was founded

4    by surfers in North San Diego County and is active throughout California's coastal

5    communities. CERF was established to advocate for the protection and enhancement of

6    coastal natural resources and the quality of life for coastal residents. One of CERF's

7    primary areas of advocacy is water quality protection and enhancement.

8        19.    Many of Plaintiffs' members live and/or recreate in and around the

9    Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail,

10   boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in

11   scientific studies and restoration efforts, among other activities.

12       20.    Plaintiffs and Plaintiffs' members have an interest in accurate information

13   about Defendant's discharges. Defendant's failure to accurately report and monitor

14   impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to

15   fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific,

16   educational, and spiritual purposes.

17       21.    Defendant's storm water pollution frustrates Plaintiffs' mission. Plaintiffs

18   have diverted their limited resources to investigate, research, gather documents from

19   regulatory agencies, and consult with experts in order to understand the extent of the

20   harm Defendant's ongoing pollution causes in and around the Receiving Waters.

21   Plaintiffs have dedicated substantial resources and time into their works and investigation

22   regarding Defendant's storm water pollution. At the time Plaintiffs undertook their

23   investigation into the Facility, the resources spent were not related to any litigation.

24   Plaintiffs would have used their limited resources on other matters had it not been for

25   Defendant's conduct.

26       22.    Defendant's failure to comply with the procedural and substantive

27   requirements of the IGP and the CWA results in discharges of polluted storm water to the

28   Receiving Waters. Defendant's polluted discharges degrade water quality and harm

aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

23.    The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

24.    The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

25.    An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

26.    The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

27.    Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

28.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

29.    "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

30.    The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that

could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

31.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

32.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

33.    Private citizens may sue under the Clean Water Act to enforce the specific provisions of California's Industrial General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B.    California's IGP.**

34.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

35.    California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

36.    The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

37.    Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

38.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

39.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC code 5093 require coverage by the Permit. *Id*., Attachment A.

40.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.     The IGP Discharge Prohibitions.**

41.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this [Industrial] General Permit or another NPDES permit." *Id*. § III.A.

42.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

43.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

44.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

45.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

46.     Accordingly, where the discharge does not meet water quality objectives, the

discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

### D.    The IGP Effluent Limitations.

47.    The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

48.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

49.    Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

50.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The EPA Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

51.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

52.    Failure to develop or implement BMPs that constitute BAT and BCT is an

1  IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

2  **E.    The IGP Receiving Water Limitations.**

3  53.    The IGP Receiving Water Limitation prohibits storm water discharges and
4  authorized non-storm water discharges from adversely impacting human health or the
5  environment. 2015 & 2020 Permits § VI.B.

6  54.    Storm water discharges with pollutant levels that exceed levels known to
7  adversely impact aquatic species and the environment are violations of the IGP's
8  Receiving Water Limitations. *Id.*

9  55.    The IGP Receiving Water Limitation prohibits storm water discharges that
10  cause or contribute to an exceedance of any applicable water quality standard contained
11  in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.
12  *Id.* § VI.A.

13  56.    Water quality standards ("WQSs") consist of both "designated uses" for a
14  body of water and a set of "criteria" specifying the maximum concentration of pollutants
15  that may be present in the water without impairing its suitability for designated uses. 33
16  U.S.C. § 1313(c)(2)(A).

17  57.    WQSs applicable to dischargers covered by the IGP include, but are not
18  limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants
19  for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan
20  WQSs must be attained at the point of discharge.

21  58.    The Basin Plan identifies designated "Beneficial Uses" for water bodies in
22  the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

23  59.    The Beneficial Uses for Forrester Creek include municipal and domestic
24  supply; industrial services supply; contact water recreation; non-contact recreation;
25  warm-freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

26  60.    The Beneficial Uses for the Spring Valley Creek and the Sweetwater River
27  include municipal and domestic supply; industrial service supply; contact water
28  recreation; non-contact recreation; warm-freshwater habitat; and wildlife habitat. Basin

Plan, Table 2-2.

61.    The Beneficial Uses for the San Diego Bay include industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; estuarine habitat; migration of aquatic organisms; spawning, reproduction, and/or early development; shellfish harvesting; and rare, threatened, or endangered species. Basin Plan, Table 2-2.

62.    The Beneficial Uses for the Pacific Ocean include industrial service supply; navigation; contact and non-contact recreation; commercial and sports fishing; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; marine habitat; aquaculture; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. Basin Plan, Table 2-3.

63.    Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

64.    According to the current 303(d) List of Impaired Water Bodies, Sweetwater River is impaired for benthic community effects, bifenthrin, chlorpyrifos, indicator bacteria, nitrogen, dissolved oxygen, phosphorus, pyrethroids, total dissolved solids, and toxicity. The San Diego Bay is impaired for mercury, PAHs (polycyclic aromatic hydrocarbons), and PCBs (polychlorinated biphenyls). The Pacific Ocean shoreline near the San Diego Bay is impaired for indicator bacteria. California 2020-2022 Integrated Report.

65.    Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

66.    The following WQSs are established by the Basin Plan for the Spring Valley Creek downstream of the Facility: iron, 0.3 mg/L and pH "shall not be depressed below 6.5 or raised above 8.5" in inland surface waters. Basin Plan at 3-21.

67.    Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQSs, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.    The IGP Storm Water Pollution Prevention Plan Requirements.**

68.    Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

69.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

70.    The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

71.    Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020

Permit §§ I.K.69, X.A.9, X.B.1. The IGP requires dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

72.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id.* § XV.

**G.     The IGP Monitoring and Reporting Requirements.**

73.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id.* §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

74.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

75.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

76.     A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id.* § XI.B.1.

77.     The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id.* § XI.B.2.

78.     Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

79.     Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

80.     Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

81.     Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

82.     Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

83.     Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual Report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 and 2020 Permits, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

84.     All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

**H.     The IGP Exceedance Response Action Requirements.**

85.      The 2015 and 2020 Permits incorporate a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERA"). 2015 Permit § I.M.61; 2020 Permit § I.N.75. The NALs/TNALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an

iterative process whereby the facility Owners and/or Operators must engage in specific ERAs as required by the 2015 and 2020 Permits.

86.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. 2015 & 2020 Permits § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. *Id*. The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id.* §§ XII.C.1.a-b. The evaluation must include the identification of the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL/TNAL exceedances and to comply with the requirements of the General Permit. *Id.* § XII.C.1.c. Although the evaluation may focus on the drainage areas where the NAL/TNAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id.*

87.     Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2. The Level 1 ERA Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. *Id.* §§ XII.C.2.a.i-ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id.* A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented,

1    and results from four (4) consecutive qualified storm events that were sampled

2    subsequent to BMP implementation indicate no additional NAL/TNALs exceedances for

3    that parameter. *Id.* § XII.C.2.b. A permittee will enter a Level 2 status if there is a NAL

4    exceedance of the same parameter when the discharger is in Level 1 status. *Id.* § D.

5    **V.    FACTUAL BACKGROUND**

6        **A.    Facility Site Information, Industrial Activities, and Pollutant Sources.**

7        88.    The SMARTS database indicates Defendant has been covered under the IGP

8    since at least May 11, 2017 to conduct industrial operations at the Facility, under Waste

9    Discharge Identification ("WDID") Number 9 37I027174.

10        89.    The Facility's Standard Industrial Classification ("SIC") code is 5093 (Scrap

11    and Waste Materials), which requires Industrial General Permit coverage.

12        90.    According to the Facility's NOI, the Facility is 10,000 square feet, and the

13    entire property is exposed to storm water.

14        91.    The Facility is a recycling facility that conducts "all activities required to

15    recycle CRV materials, and metals."  SWPPP at 9. This entails weighing scrap material,

16    loading and unloading scrap waste, sorting the metals, and storing waste until it may be

17    transferred offsite.  The Facility stores segregated materials in multiple roll-offs for up to

18    thirty days, after which it is transferred offsite via the driveway to Jamacha Road.

19        92.    The SWPPP states the Facility handles multiple tons of numerous industrial

20    materials each month, including scrap stainless steel, iron, aluminum, copper, brass, lead,

21    nickel, CRV plastic, CRV aluminum, CRV glass, electric motors, batteries, and other

22    industrial equipment. *Id.*

23        93.    The SWPPP also acknowledges that these materials generate pollutants

24    associated with storm water discharges including iron, aluminum, copper, zinc, lead,

25    nickel, oil and grease, and acid. *See generally* SWPPP.

26        94.    Storm water discharges from the Facility enter the County of San Diego

27    storm sewer system ("MS4"), and thereafter flow into the Spring Valley Creek, the

28    Sweetwater River, the San Diego Bay, and the Pacific Ocean.

95.     Industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

96.     Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

97.     Pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

98.     One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

99.     If regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

100.    Due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

101.    Industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the Facility and into storm water discharge points, which flow to Receiving Waters.

102.    Defendant has failed and continues to fail to develop and/or implement

required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

103.    Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

104.    The Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

105.    Elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

106.    Illegal discharges of polluted storm water and non-storm water from the Facility impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.    The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

107.    With every significant rain event, the Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

108.    The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

109.    Storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions and Effluent Limitations of the IGP.

**1.    Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

110.    The Facility has discharged and continues to discharge unauthorized NSWDs in violation of the Industrial General Permit. For example, publicly available images from Google Maps street view shows an unidentified liquid originating from within the Facility, discharging out the driveway, flowing into the curb gutter, and toward

an MS4 inlet mere feet away from the Facility's driveway. *See* Ex. 1. Thus, the Facility Owners and/or Operators have failed to prevent NSWDs from comingling and/or discharging from the Facility, in violation of the Industrial General Permit Discharge Prohibition III.B.

111.    The Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

112.    The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

113.    "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

114.    The Facility has discharged, and continues to discharge, numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters.

115.    The Facility's and CERF's sampling data show discharges with high concentrations of (1) metals such as iron, zinc, manganese, copper, aluminum, cadmium, and lead (2) pH-affecting substances, (3) TSS, (4) chemical oxygen demand, and (5) nutrients such as phosphorus and nitrogen in excess of various water quality objectives, benchmarks, and other standards that were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. Such discharges of polluted storm water violate the Permit. *See* Ex. 1. These polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

116.    Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

For example, CERF's monitoring data of the Facility's discharge on February 1, 2024 shows concentrations of (1) metals such as iron, zinc, manganese, and copper (2) pH-affecting substances, (3) TSS, and (4) nutrients such as phosphorus and nitrogen, in excess of respective Basin Plan Water Quality Objectives and the CTR. *See* Ex. 1. Thus, the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

117.    Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

118.    "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

119.    Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

120.    Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

121.    The Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

122.    Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.B, III.C, and III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

123.    These Discharge Prohibition violations are ongoing and will continue every

time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

124.    The Facility has been in violation of these Discharge Prohibitions since at least December 17, 2019 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Ex. 1. (setting forth dates of all precipitation events during the past five years).

## 2.  Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

125.    Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

126.    BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Facility.

127.    CERF's storm water monitoring data indicates that the Facility's storm water discharges exceed the EPA Benchmarks for TSS, chemical oxygen demand, copper, cadmium, aluminum, nitrogen, lead, and zinc. For example, on February 1, 2024, the Facility discharged concentrations of copper at 0.83 mg/L, over one hundred and forty times higher than the EPA Benchmark of 0.0059 mg/L. *See* Ex. 1. Thus, sampling data collected indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements. *See* Ex. 1.

128.    As discharges containing pollutant concentrations that exceed EPA Benchmarks indicate the Facility has not developed and/or implemented BMPs that meet BAT/BCT requirements, the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

129.    Further, visual observations and photographs of the Facility confirm that it lacks BMPs that would achieve BAT/BCT. The SWPPP claims that the Facility covers outdoor stored materials with tarps prior to rain. SWPPP at 21. However, as indicated in Exhibit 1, Plaza Alta failed to deploy any covers for the February 1, 2024 rain event.

Thus, the Facility failed to implement even the most basic BMPs indicated in its SWPPP, like tarping, which would prevent pollutant exposure and runoff from industrial material from entering the storm water discharge. Moreover, Exhibit 1 reveals significant storage of crushed, discarded water heaters which have the potential to leak mercury from pilot light sensors, asbestos from insulation, heavy metals like lead, and sediment. In addition, hazardous gases may be present if the tank is not properly emptied.

130.    Such poor housekeeping and ineffective implementation of supposed BMPs fail to constitute BAT/BCT and cast doubt regarding the efficacy of other BMPs identified in the SWPPP. Thus, the Facility Owners and/or Operators have failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of the Industrial General Permit.

131.    Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

132.    These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

133.    The Facility has been in violation of these Effluent Limitations since at least December 17, 2019 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.  Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.

134.    The Facility has violated and continues to violate IGP Receiving Water Limitations.

135.    The Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

136.    Sweetwater River is impaired for phosphorus and nitrogen. Storm water

samples collected from the Facility on February 1, 2024 show concentrations of phosphorus at 0.87 mg/L, far exceeding the Basin Plan objective of 0.1 mg/L, and nitrogen at 1.4 mg/L, over the Basin Plan objective of 1 mg/L. *See* Ex. 1. Because the Facility has never sampled for nitrogen and phosphorus itself, its potential discharge at levels above the Basin Plan has likely gone undetected for years.

137.    The Sweetwater River is impaired for low dissolved oxygen. Excess concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move up the food chain. U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment (last updated Apr. 15, 2019). High phosphorus and nitrogen loading also results in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes. As such, the Facility's polluted discharges cause and/or contribute to Sweetwater River's dissolved oxygen, nitrogen, and phosphorus impairments. *See* Ex. 1.

138.    The Sweetwater River is impaired for toxicity. Zinc, lead, and copper are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38. The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairments of the Sweetwater River.

139.    The Sweetwater River is impaired for total dissolved solids ("TDS"). Dissolved solids in natural waters may consist of carbonates, bicarbonates, chlorides, sulfates, phosphates, nitrates, magnesium, sodium, iron, manganese and other substances." Basin Plan at 3-32. Therefore, the Facility's discharges of high concentrations of iron and manganese cause and/or contribute to the Sweetwater River's TDS impairment.

140.    Sweetwater River is impaired for benthic community effects. The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in

concentrations of solids that cause nuisance or adversely affect beneficial uses." *Id.* "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id.* As such, the Facility's polluted discharges of excessive TSS cause and/or contribute to the Sweetwater River benthic community effects impairment.

141. The Basin Plan and CTR are applicable WQSs under the IGP.

142. Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020 Permits § VI.A.

143. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

144. Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP.

145. The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

146. The Facility has been in violation since December 17, 2019.

/././
/././
/././
/././
/././
/././

**4.  Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

147.    Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

148.    The Facility is currently operating without a valid SWPPP.

149.    The Regional Board conducted an inspection on August 8, 2023 and noted SWPPP deficiencies. The Regional Board found that the SWPPP (1) lacks adequate discussion of the activities conducted onsite, (2) must indicate the Facility's monitoring schedule for the reporting years, and (3) should be updated as necessary to reflect additional BMPs. *See* Ex. 1. To date, the Facility has failed to upload an updated SWPPP that addresses these noted deficiencies.

150.    The SWPPP fails to provide a comprehensive list of industrial activities and the associated narrative descriptions. 2015 & 2020 Permits § X.G.1.  During their inspection, Regional Board staff noted the Facility was engaged in dismantling automobiles for scrap. A Facility owner claimed in response that the site no longer dismantles automobiles. However, a CERF representative witnessed totaled automobiles onsite during the February 1, 2024 inspection. *See* Ex. 1. Thus, the Facility continues to dismantle automobiles and the SWPPP has not been updated to reflect associated industrial activities.

151.    The SWPPP also fails to adequately analyze the associated pollutants with the industrial activities and processes. 2015 & 2020 Permits § X.G.2. For example, it simply lists "particulates" as the associated pollutant for several industrial materials. SWPPP at 11. However, "particulates" does not provide the required specificity. The SWPPP must name the typical components in the particulate form, like aluminum for CRV aluminum cans. Similarly, because the SWPPP fails to list all industrial activities, it also fails to enumerate all associated pollutants with the Facility's operations.

152.    In light of the presence of particulates, the SWPPP must also conduct a dust and particulate analysis. *Id*. Specifically, the SWPPP should include discharge locations,

the particulate source, and characteristics of the particulates. 2015 & 2020 Permits §
X.G.1.c. However, the SWPPP omits this information.

153.   The SWPPP correctly identifies Sweetwater River as a Receiving Water.
However, the SWPPP fails to adequately analyze whether any potential pollutants would
cause or contribute to the Sweetwater River's impairments. SWPPP at 8. Contrary to the
SWPPP's claims, the Facility discharges into a water body on the 303(d) list, as the
Sweetwater River is unfortunately impaired for numerous pollutants.

154.   Because the Facility fails to list all the industrial activities and associated
pollutants, the SWPPP likewise fails to identify and implement BMPs to reduce exposure
of pollutants associated with such activities. 2015 & 2020 Permits § X.H.  The SWPPP
must (1) identify what BMPs are being implemented to prevent specific pollutant sources
from entering storm water, (2) identify the pollutant this is intended to prevent (like metal
particulates), (3) describe the frequency, location, and duration of these BMPs, (4) the
individual responsible for implementation and procedures, (5) the equipment necessary,
and (6) the visual observations' schedule in place to continue to monitor BMP
effectiveness.

155.   The SWPPP fails to adequately (1) describe dust and particulate generating
activities; and (2) to assess potential pollutant sources by, at a minimum, including (i) the
areas of the facility with likely source of pollutants in industrial storm water discharges
and authorized NSWDs; (ii) the pollutants likely to be present in industrial storm water
discharges and authorized NSWDs; (iii) the approximate quantity, physical
characteristics (e.g., liquid, powder, solid, etc.), and locations of each industrial material
handled, produced, stored, recycled, or disposed; (iv) the degree to which the pollutants
associated with those materials may be exposed to, and mobilized by contact with, storm
water; (v) the direct and indirect pathways by which pollutants may be exposed to storm
water or authorized NSWDs; (vii) the effectiveness of existing BMPs to reduce or
prevent pollutants in industrial storm water discharges and authorized NSWDs; and (viii)
the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to

reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs. 2015 & 2020 Permits, § X.G.1.c.

156.   The Facility site map is also defective. 2015 & 2020 Permits § X.E.3. The map fails to note (1) the extensive outdoor storage of industrial materials that lines the northern Facility perimeter and (2) does not show any dust generating locations.

157.   The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the Industrial General Permit. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. Despite the significant concentrations of pollutants in the Facility's storm water discharges, and the copious amounts of outdoor storage, information available to Coastkeeper and CERF indicates the Facility SWPPP has remained virtually the same since at least its initial upload in 2017 and has not been revised to include additional BMPs to eliminate or reduce pollutants in the Facility's storm water discharges, as required by the Permit.

158.   Defendant has operated the Facility since at least December 17, 2019 without a valid SWPPP. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act. Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least December 17, 2019.

159.   Therefore, Plaza Alta has also failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water and the subsequent discharge of pollutants from the Facility, in violation of the Permit. CERF and Coastkeeper's direct observations, and publicly available photos, strongly evidence that the Facility has failed, and continues to fail to implement even minimum BMPs.

160.   These violations are ongoing and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

/././

**5.  Defendant Has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan at the Facility.**

161.  Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

162.  The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Permit. The Facility notes nickel as a potential pollutant found in its sorting area, material storage, and outside storage. SWPPP at 11. However, the Facility fails to list or test for nickel as a constituent in its MIP storm water testing. CERF's storm water sampling also found high concentrations of cadmium in the Facility's discharge. This pollutant stems from the Facility's many outdoor industrial activities like auto dismantling. Plaza Alta's failure to include these parameters in the Facility's MIP is an ongoing violation of the Permit.

163.  The Facility Owners and/or Operators have also failed and continue to fail to collect the required number of storm water samples for each reporting period. The Permit requires facilities in a compliance group to collect two samples each reporting period. However, since at least 2019, the Facility has not collected the required number of storm water samples. *See* Ex. 1, Table 1. The Facility Owners and/or Operators' failure to collect the required number of storm water samples during each reporting period has violated and continues to violate the Permit.

164.  The Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. On information and belief, including the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

165.  Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

166.    Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least December 17, 2019.

167.    These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least December 17, 2019.

### 6.  Defendant Has Violated the IGP's Reporting Requirements.

168.    Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

169.    In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this Industrial General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits § XXI.N.

170.    The Facility Owners and/or Operators have submitted multiple Annual Reports which were certified attesting to the Facility's compliance with the terms of the Permit. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. As discussed, the Facility has violated, and continues to violate, numerous provisions of the Permit. The Facility's Legally Responsible Person (LRP) knew or should have known the Facility failed to comply with numerous procedural and substantive provisions of the Permit, and thus certifications of the Facility's Annual Reports were erroneous.

171.    Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of

the Clean Water Act, 33 U.S.C. § 1311(a).

172.    Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least December 17, 2019.

173.    These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since December 17, 2019.

### 7. Defendant Has Violated the IGP's Exceedance Response Action Requirements.

174.    The Facility Owners and/or Operators have failed to comply with several of the Industrial General Permit's ERA requirements.

175.    The Facility's storm water monitoring data for the 2019-2020 reporting period shows the Facility exceeded the annual average NAL for aluminum, iron, and zinc. The Owners and/or Operators submitted a Level 1 ERA report on March 2, 2021, well after the January 1, 2021 deadline. However, Plaza Alta failed to complete any SWPPP revisions or effectively implement the BMPs identified in the Level 1 ERA Report, as evidenced by the Facility's continuing exceedances for aluminum, iron, and zinc, as well as the many other pollutants identified in Exhibit 1. The Facility also entered Level 1 status for COD during the 2023-2024 reporting period and has yet to submit a Level 1 ERA Report for that pollutant.

176.    The Facility Owners and/or Operators have failed and continue to fail to conduct adequate Level 1 status evaluations and prepare reports that comply with the Industrial General Permit.

177.    As such, the Facility Owners and/or Operators are in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Reports, is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

178.    The Facility Owners and/or Operators have been in daily and continuous

violation of the Industrial General Permit's Level 1 status ERA evaluation requirement every day since October 1, 2020. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to submit adequate Level 1 ERA Report every day since January 1, 2021. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act and Industrial General Permit's requirements.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

179. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

180. Defendant has discharged and continues to discharge unauthorized non-storm water discharges in violation of discharge prohibition III.B. of the 2015 and 2020 Permits.

181. Defendant has discharged and continues to discharge NSWDs in violation of Section III.B of the IGP.

182. Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

183. Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

184. Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least December 17, 2019 to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

185. Each and every violation of the IGP Discharge Prohibitions is a separate and

distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 17, 2019 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

186.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

187.    Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

188.    Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

189.    Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

190.    Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

191.    Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from at least December 17, 2019 to the present. Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

192.    Each day that Defendant operates the Facility without adequately developing

and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

193.    Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since December 17, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP Receiving Water Limitations and the Porter-Cologne Act.**

**Cal. Water Code §§ 13263(a), 13350(a) and Cal. Bus. & Prof. Code § 17203**

194.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

195.    The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

196.    Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

197.    Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

198.    Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

199.    Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"). Cal. Water Code §§ 13350(a), 13263(a).

200.    Defendant violated and will continue to violate the IGP Receiving Water

Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

201.  Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from December 17, 2019 to the present. Defendant's violations of the IGP Receiving Water Limitations and the Portor Cologne Act are ongoing and continuous.

202.  Defendant will continue to be in violation of the IGP and the Porter-Cologne Act each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

203.  Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of the California Business and Professions Code Section 17200.

204.  Defendant is a person under Cal. Bus. & Prof. Code § 17201.

205.  Plaintiffs and its members have been and will continue to suffer injury and harm as a result of Defendant's unlawful conduct. Plaintiffs have suffered injury in fact and monetary harm because they have dedicated resources to investigating and stopping Defendant's conduct that would not have been necessary but for Defendant's illegal actions and which could have been used on other matters.

206.  Defendant's ongoing pollution of heavy metals and other pollutants into the Receiving Waters frustrates Plaintiffs' mission.

207.  This Court has jurisdiction to enjoin Defendant's unlawful conduct that violates Cal. Water Code § 13350(a), 13263(a) under Business and Professions Code Section 17203.

/././

/././

/././

# FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

208.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

209.   Defendant has failed and continues to fail to develop and/or implement an adequate SWPPP for the Facility.

210.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

211.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

212.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from at least December 17, 2019, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

213.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

214.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since December 17, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/././

/././

/././

## FIFTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

215.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

216.   Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

217.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

218.   Defendant has been in violation of the IGP MIP requirements every day from at least December 17, 2019, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

219.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

220.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since December 17, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

221.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

222.   Defendant has failed and continues to fail to conduct the requisite visual

observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

223.    Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

224.    Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

225.    Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least December 17, 2019. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

226.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

227.    Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since December 17, 2019. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

228.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

229.    Defendant has failed and continues to fail to implement its Level 1 ERA Report as evidenced by the ongoing contamination exceedances. 2015 & 2020 Permits § XII.C.2.

230.   Defendant has failed and continues to fail to update its SWPPP to reflect its Level 1 ERA Report. 2015 & 2020 Permits § XII.C.

231.   Defendant's failure to comply with the IGP ERA requirements is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XII.C.2; *see also* 33 U.S.C. § 1311(b).

232.   Defendant conducts operations at the Facility each day without following ERA requirements. Defendant has been in violation of the IGP's ERA evaluation requirements every day since at least October 1, 2020. Defendant has been in violation of the IGP's Level 1 ERA reporting requirements since January 1, 2021. Defendant's violations of the ERA requirements of the IGP and the CWA are ongoing and continuous.

233.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP ERA requirements at the Facility.

234.   Each and every violation of the IGP ERA reporting requirement is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since October 1, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VII.   RELIEF REQUESTED

235.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant has violated and continues to be in violation of Sections 13263(a) and 13350(a) of the Porter Cologne Act, Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the

Facility to surface waters in violation of the Clean Water Act and IGP;

      c.    A court order enjoining Defendant from continuing its violations of the Porter-Cologne Act Sections 13263(a) and 13350(a) pursuant to Business and Professions Code Section 17203;

      d.    A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

      e.    A court order assessing civil monetary penalties for each violation of the CWA at $ 68,445 per day per violation for violations that occurred after November 2, 2015 and assessed on or after January 8, 2025  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

      f.    A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure Section 1021.5; and

      g.    Any other relief as this Court may deem appropriate.

Dated: April 2, 2025

                         Respectfully submitted,

                         COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

                         SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org